UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
AMERICAN GENERAL LIFE INSURANCE                             :
COMPANY,                                                    :
                                                            :
                              Plaintiff,                    :   08-cv-06843 (NSR)
           -against-                                        :   OPINION AND ORDER
                                                            :
DIANA SPIRA 2005 IRREVOCABLE LIFE                           :
INSURANCE TRUST, AARON AZRYLEWITZ,                          :
as Trustee, and SIMON SPIRA,                                :
                                                            :
                              Defendants.                   :
------------------------------------------------------------X

NELSON S. ROMÁN, United States District Judge:

    Plaintiff American General Life Insurance Company ("American General") commenced this action by complaint filed July 31, 2008, against Defendants Diana Spira 2005 Irrevocable Life Insurance Trust, Aaron Azrylewitz as trustee (jointly, the "Trust"), and Simon Spira. With this action, as narrowed by the parties' partial settlement (*see* dkt. no. 120), American General seeks to void and rescind a life insurance policy issued in 2005 (the "Policy"), which American General allegedly issued based on material misrepresentations concerning Diana Spira's income and net worth made in a policy application and accompanying financial questionnaire.

    Simon Spira ("Simon") and Diana Spira ("Diana") were husband and wife. Both are deceased at this time, and Simon's estate has been terminated from this action pursuant to the parties' partial settlement, which resolved all claims centered on a second life insurance policy issued in 2006. Intervening third-party plaintiffs, the Spiras' children, likewise have been terminated from the action pursuant to the settlement. Thus, American General and the Trust are

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/25/2014

1

the only remaining parties.  American General and the Trust now move and cross-move, respectively, for summary judgment pursuant to Federal Rule of Civil Procedure 56.

American General moves for summary judgment on Count Three of its complaint, which seeks declaratory relief rescinding the Policy.  American General also moves to dismiss the Trust's counter-claim for breach of contract.  American General thereby seeks to avoid any contractual obligation to pay the Trust the $5 million face value of the Policy.  The Trust opposes American General's motion and cross-moves for summary judgment based on the affirmative defenses of waiver and estoppel.

The two motions are consolidated for purposes of this opinion and order.  Both motions are DENIED for the reasons outlined below.

## I.  FACTS

The facts are gleaned from the parties' Rule 56.1 statements, declarations, and exhibits, and are not in dispute, except where so noted.  As a threshold matter, American General moves to strike certain statements in the Trust's Rule 56.1 statement of material facts.  The Court grants that motion as to argumentative statements in the Trust's Rule 56.1 submission and as to purported factual statements which are unsupported by any citation to record evidence.  *See Goldstick v. Hartford, Inc.*, No. 00-cv-8577, 2002 U.S. Dist. LEXIS 15247, at *3 (S.D.N.Y. Aug. 19, 2002).  Beyond that, the motion is denied with respect to the Rule 56.1 statement.

American General also moves to strike categories of exhibits accompanying the Trust's Declaration of David Benhaim (the "Benhaim Declaration" or "Benhaim Decl.") which American General contends are either "unauthenticated exhibits" (exhibits A-G, I, AA, BB, GG) or "inadmissible hearsay" (exhibits A-G, I, J, AA, BB).  That portion of the motion to strike is denied.  It is true that factual assertions in an affidavit from counsel merely "familiar with the

facts and circumstances of the matter" are insufficient on summary judgment and may be stricken. *See Batori v. Am. Permalight, Inc.*, No. 03-cv-8960, 2004 U.S. Dist. LEXIS 23233, at *8 (S.D.N.Y. Nov. 16, 2004). Here, however, the Benhaim Declaration, and a supplement thereto, do not contain substantive factual assertions. Rather, the declarations seek to establish only, based on personal knowledge of the litigation, that American General produced in discovery the purportedly "unauthenticated exhibits." The Court finds that the declarations are sufficient at this stage of the proceedings, where there does not appear to be a good faith dispute about the nature or reliability of these documents. *Cf. John Paul Mitchell Sys. v. Quality King Distribs. Inc.*, 106 F. Supp. 2d 462, 472 (S.D.N.Y. 2000) (documents' form and content, coupled with the act of production, suffices for authentication purposes at the preliminary injunction stage of the proceedings). Presumably, the Trust will call an American General custodian of records as a trial witness to further authenticate these documents at the appropriate time, or the parties will arrive at a stipulation. Additionally, the Court denies the motion to strike insofar as it is based on the hearsay rule, as the documents in question, on their face, appear to be admissible business records. *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 215 (S.D.N.Y. 2007), *aff'd* 354 Fed. App'x 496, 496 (2d Cir. 2009) ("Hearsay evidence is admissible at the summary judgment stage if the contents would otherwise be admissible at trial.").

The Court also denies the motion to strike certain exhibits on grounds of relevance, which is an objection that, at this stage, largely goes to the weight accorded any particular document. Finally, based on the representations in the supplemental Benhaim declaration, the Court denies the motion to strike exhibit GG, which is a document summarizing voluminous business records. *See* Fed. R. Evid. 1006; *see also Commercial Data Servers, Inc. v. IBM*, 262 F.

Supp. 2d 50, 58 n. 3 (S.D.N.Y. 2003) (permitting submission of supplemental affidavit or declaration to further authenticate documents on summary judgment).

Having so ruled on the motion to strike, the Court will endeavor to summarize the material facts of this case.

### A.  Policy Application

On November 7, 2005, Diana Spira as the insured, and the Trust as owner and beneficiary, executed an application for a $5 million Flexible Premium Adjustable Life Insurance Policy from insurer, American General.  Declaration of Kathleen Maio ("Maio Decl.") Ex. A-3.  Diana was eighty-three years old at that time.  The purpose of the Policy was to insure her life, and thereby to provide cash to cover estate taxes and other costs expected at the time of her death.  *See id.*  The Trust was the proposed beneficiary of the Policy.  Aaron Azrylewitz ("Azrylewitz") was the trustee of the Trust, and the Trust beneficiaries were:  Kolel Emems Vemunah Viznitz (a non-profit organization); and the Spiras' two sons, Gershon and Sholem. *Id.*

Although the Policy application described Diana as "retired," it also represented household income of $600,000 (presumably, annualized) and a net worth of $13 million.  *Id.*  The anticipated premium payment was $356,000 annually.  *Id.*  The Policy application noted three other life insurance policies previously issued on Diana's life (1991, $100,000; 1995, $250,000; and 1999, $1.5 million).  *Id.*[1]  Diana signed the application as proposed insured, and Azrylewitz signed on behalf of the Trust.  In executing the application, the signatories attested to having read the statements therein, and they affirmed that the statements were "true and complete to the best of [their] knowledge and belief."  *Id.*  Inexplicably, Denver, Colorado is

---

[1] Two other American General-underwritten policies also existed, with a total face value of $250,000, for an aggregate of $2,100,000 then existing on Diana's life.  Benheim Decl. Ex. L.

listed as the place of execution, but the parties agree that the application and other relevant documents were generated and executed in New York, where all relevant individuals are domiciled.

### B. American General's Diligence

#### 1. Financial Questionnaire

Before issuing the Policy, American General gathered other supporting information from Diana, Simon, and Azrylewitz. First, American General procured additional written submissions from Diana on a financial questionnaire dated the same day as the Policy application, November 7, 2005. Maio Decl. Ex. A-4. On the questionnaire, Diana again represented that her pre-tax income from all sources was $600,000. She specified that this included $120,000 in salary or wages and $480,000 in unearned income (interest, dividends, and real estate income). *Id.* Diana again represented that her net worth was $13 million, which she specified was $11.87 million in personal assets and $1.6 million in business assets, with $397,000 in liabilities (mortgages and estate taxes). *Id.* As they did for the Policy application, Diana and Azrylewitz signed the financial questionnaire and thereby affirmed that the information stated therein was "full, complete and true to the best of [their] knowledge and belief," and moreover, that the questionnaire responses were a continuation and part of the Policy application. *Id.* In contrast to the application itself, however, the financial questionnaire prompted Diana for her ("your") income and net worth, and neither the prompts nor the responses clarified whether the figures encompassed the entire household (i.e., Diana *and* Simon) or just Diana. *See id.*

#### 2. Amplified Inspection Report

On November 15, 2005, a third-party vendor to American General, Infolink, generated an "Amplified Inspection Report," as an additional form of American General underwriting

diligence concerning the Policy application. Benhaim Decl. Ex. M. Infolink's report detailed Diana's medical history and the absence of many risk factors (e.g., smoking cigarettes and driving). In a financial section of the report, it stated that the applicant, Diana, provided joint financial information with annual rental income of $600,000. The report noted, however, that the applicant "declined to provide specific personal assets," even while estimating her net worth as $15,000,000 to $18,000,000, "primarily comprised of real estate," with "no outstanding liabilities." *Id.*

### 3. Mid-Level Inspection Report

On November 18, 2005, American General ordered a second report from third-party vendor, LabOne. The "Mid-Level Inspection Report" was generated on December 12, 2005. *Id.* Ex. S. This report likewise detailed Diana's medical history and the absence of many risk factors, and then laid out income and asset figures based on Simon's responses gathered through a telephonic interview (Diana is said to have been present in the background). *See id.*

The report contained the term "declined" (presumably, the interviewee declined to state) in certain unearned income rows (dividends, interest, net rentals) and noted only $19,200 in the "other unearned income" and "total unearned income" rows. *Id.* For assets, the form again contained the term "declined" in the stocks/bonds and cash rows and noted $1,000,000 and $12,000 in the real estate and car rows, respectively. *Id.* The form noted $0 in the total liabilities row and $1,212,000 in the total net worth row. *Id.* Thus, the ultimate income and net worth estimates reflected in this report were substantially less than the estimates in the Policy application, the financial questionnaire, and the Amplified Inspection Report.

Separately, the Mid-Level Inspection Report indicated that Diana had certain credit "violations," including at least one account in collections, and a credit limit of only $27,500. *Id.*

The report also included a question American General says was put to Simon regarding other insurance existing on Diana's life.  Reflecting his response, the report noted only $100,000 in preexisting insurance with New York Life, which, of course, is far less than the aggregate $2.1 million known to have been issued by way of five separate, preexisting policies.  *Id.*

### C. American General's Underwriting Standards

The parties have very different views of American General's underwriting standards, both in general, and as those standards relate to the Policy.  American General's "concierge group" underwrote the Policy.  Supplemental Declaration of Jessica L. Wilson ("Wilson Suppl. Decl.") Ex. B-9.  That group specialized in underwriting "high-value" policies, which are often issued for elderly applicants and are classified as high-value because the premiums are quite high.  *See id.*

At least in principle, American General and the concierge group follow underwriting guidelines developed by Swiss Reinsurance Company ("Swiss Re").  Maio Decl. ¶ 7.  The guidelines are designed to assess mortality risk and the potential financial consequences of a person's death.  *Id.*  Income replacement is one variable the guidelines consider, and the guidelines specify that, beyond the age of sixty-five, insurance for the purpose of income replacement usually should not exceed three or four times income.  *Id.* Ex. A-1 at AGS 1119-1120.

Estate planning costs are another consideration, and they were the primary consideration and motivation for Diana's policy.  *See id.* Ex. A-3 at AGS 332.  The Swiss Re guidelines support issuance of insurance policies with a face value of approximately 50% of the net present value of an estate's expected net worth at the time of death.  *Id.*  Thus, if following Swiss Re guidelines, American General underwriters often will rely on an applicant's estimated income

and net worth in deciding whether to issue a policy, and in calculating how large a policy to issue.

### D. Policy Issued

As noted, Diana and the Trust applied for a $5 million policy. On December 15, 2005, after the aforementioned diligence, American General approved the proposed $5 million face value and issued that policy. *Id.* Ex. A-3. American General contends that in doing so, it relied on material misrepresentations in the November 7, 2005 application and financial questionnaire, namely, that Diana had $600,000 in income and $13 million in net worth.

The Trust disputes the contention that these figures were material, and the Trust challenges the adequacy of available proof of Diana's true income and net worth. But the parties appear to agree that neither she, nor Simon and her together, had $600,000 in income or $13 million in net worth in 2005.

### E. Premiums Paid, Diana's Death and Claims Made

American General received all required premium payments for the Policy, the last of which it received in January 2007. Supplemental Declaration of Kathleen Maio ("Maio Suppl. Decl.") ¶ 5. Diana then died on June 7, 2007, less than two years from the date American General issued the Policy. Maio Decl. Ex. A-6. On June 13, 2007, Azrylewitz completed a Proof of Death Claimant's Statement on behalf of the Trust, seeking a lump sum payment of $5 million under the Policy. *Id.* Ex. A-7.[2]

---

[2] An equivalent claim was made under an additional $5 million insurance policy that American General issued on Diana's life in 2006, for which Diana was the insured and Simon was the owner and beneficiary. *Id.* Ex. A-5. The parties' partial settlement eliminated any dispute as to the 2006 policy, but its issuance is noted here for context.

### F. Investigation and False Representations

American General subsequently investigated the claim, including by visiting Simon's home (Simon was alive then) to interview him and two of his grandsons. That investigative interview took place on August 29, 2007. *Id.* Ex. A-10. The Trust contends that statements made during the interview are both unreliable and inadmissible hearsay, but the parties agree that the interviewees were unable to verify representations in the Policy application and financial questionnaire regarding $600,000 in income and $13 million in net worth.

Later, at a deposition in the discovery phase of this litigation,[3] Simon testified that neither Diana, nor he and Diana, had a net worth of $13 million in 2005. Declaration of Jessica L. Wilson ("Wilson Decl.") Ex. B-2 (Tr. 88-89). Simon testified that his entire extended family probably was worth more than $13 million, but he confirmed that his immediate household consisted of only Simon and Diana, and he confirmed that those two were worth far less than the estimates on the Policy application and financial questionnaire, which he said were inaccurate. *See id.* at Tr. 99-100.

When prompted to inventory his assets, Simon described $1 million in cash in a safe and a couple hundred thousand dollars in gold and diamonds. *Id.* at 88-89. Simon testified that in 2005, he had less than $2 million in his safe and no assets elsewhere except "with the children." *Id.* As for income, Simon testified that he and his wife did not have more than $100,000 in

---

[3] Simon died shortly after his deposition, and thus he appears to be an inadmissible declarant within the meaning of Federal Rule of Evidence 804(a)(4), thus rendering his deposition testimony admissible at trial.

9

income since 2000, and in so testifying, Simon appears to have been considering both earned and unearned income.  *See id.* at 90-91.

Elsewhere, Simon's testimony left open the question of whether Diana had assets separate from his.  *See* Benhaim Decl. Ex. OO (Tr. 54 (she had "some" different assets . . . "I don't know exactly . . . I don't know what she had")).  Read as a whole, however, Simon's testimony contradicts the income and net worth representations made in the Policy application and in the financial questionnaire.

### G. Revised Analysis

American General contends that even assuming a net worth of $3 million, which is a high-end estimate based on Simon's deposition testimony, American General would not have issued the $5 million Policy, at least not if following Swiss Re guidelines.  American General contends, rather – and the Trust does not dispute this math – that Swiss Re guidelines, using a $3 million net worth estimate, support issuance of not more than $2.7 million in life insurance in 2005.  Maio Decl. ¶ 11.  The parties dispute, however, the extent to which American General strictly followed Swiss Re guidelines.  Consequently, the parties dispute the extent to which income and net worth representations in the Policy application and financial questionnaire were material.

### II.     SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 states, in pertinent part:  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of pointing to evidence in the record, "including depositions, documents . . . [and] affidavits or declarations," Fed. R. Civ. P. 56(c)(1)(A), "which it believes

10

demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party also may support an assertion that there is no genuine dispute by "showing . . . that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). If the moving party fulfills its preliminary burden, the onus shifts to the non-moving party, which must identify "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting Fed. R. Civ. P. 56); *Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 244 (S.D.N.Y. 2001).

A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013); *Gen. Star Nat'l Ins. Co. v. Universal Fabricators, Inc.*, 585 F.3d 662, 669 (2d Cir. 2009); *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). Courts must "constru[e] the evidence in the light most favorable to the non-moving party and draw[] all reasonable inferences in its favor." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (quoting *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 113 (2d Cir. 2005)). In reviewing the record, "the judge's function is not himself to weigh the evidence and determine the truth of the matter," nor is it to determine a witness's credibility. *Anderson*, 477 U.S. at 249; *see also Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) ("The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact."). Rather, "the inquiry performed is the threshold inquiry of determining whether there is the need for a trial." *Anderson*, 477 U.S. at 250.

### III. DISCUSSION

#### A. Choice of Law

As this dispute turns on the common law of contract, a brief choice of law analysis is warranted to determine which state's contract law applies. "When a federal district court sits in diversity, it generally applies the law of the state in which it sits, including that state's choice of law rules." *In re Coudert Bros. LLP*, 673 F.3d 180, 186 (2d Cir. 2012). This Court is sitting in diversity in New York, and under New York law, a "'center of gravity' or 'grouping of contacts' analysis" governs choice of law in a contract case. *Globalnet Financial.com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 383 (2d Cir. 2006) (internal citation omitted). Under that analysis, relevant considerations include: "the place of contracting, negotiation and performance; the location of the subject matter of the contract; and the domicile of the contracting parties." *Allstate Ins. Co. v. Stolarz*, 81 N.Y.2d 219, 226 (1993).

As noted, the Policy application states Denver, Colorado as the place of execution, even though no party has proffered an explanation for this. The parties agree, rather, that no relevant individual or concern has a tie to Denver and that the application for the Policy (and the negotiation thereof) took place in New York. Likewise, the insured risk, Diana, was domiciled in New York, as were all relevant individuals at the time the Policy was issued. The center of gravity for the Policy therefore is New York, not Colorado or elsewhere. The parties agree, and consequently the Court will apply New York contract law to the pending motion and cross-motion.

#### B. American General's Motion

American General's summary judgment motion is straightforward on first glance. The company argues that the Policy is void *ad initio* because it was issued in reliance on material

misrepresentations, namely, the misstatements that Diana had $600,000 in income and $13 million in net worth in 2005. For a misrepresentation to support rescission of an insurance contract, there must have been a false "statement as to past or present fact, made to the insurer by, or by the authority of, the applicant for insurance or the prospective insured, at or before the making of the insurance contract as an inducement to the making thereof." N.Y. Ins. Law § 3105(a). Scienter is not required. "Even an innocent misrepresentation, if material, will support rescission." *In re WorldCom, Inc. Sec. Litig.*, 354 F. Supp. 2d 455, 465 (S.D.N.Y. 2005).

On the threshold question of whether there was a misrepresentation, American General has met its burden. Diana and the Trust attested to statements of present fact regarding Diana's income and assets, on both the Policy application and the financial questionnaire. Subsequently, American General's investigation and evidence proffered have disproven the representations that Diana had $600,000 in income and $13 million in net worth in 2005. Although the Trust argues otherwise, Simon's deposition testimony squarely contradicts the representations. *See, e.g.*, Wilson Decl. Ex. B-2 (Tr. at 99 (Q: "In 2005, did you or Mrs. Spira or both of you together own $11.87 million in personal assets? A: "We didn't, no.")). The burden now shifts to the Trust to proffer admissible evidence demonstrating a material factual issue as to whether there was indeed a misrepresentation. The Trust challenges the clarity of Simon's deposition testimony, arguing that the testimony left enough uncertainty regarding Diana's assets to raise questions, but that is not the same as proffering rebuttal evidence. Moreover, the Court disagrees with the Trust's assessment of the deposition transcript. The Court finds that Simon's unrebutted testimony establishes that Diana misrepresented her income and net worth. This evidence would support summary judgment in American General's favor if it could be shown, as a matter of law, that the misrepresentations were material.

By statute, materiality requires that "knowledge by the insurer of the facts misrepresented would have led to a refusal by the insurer" to issue the policy under the same terms.  N.Y. Ins. Law § 3105(b); *see also Chicago Ins. Co. v. Creitzer & Vogelman*, 265 F. Supp. 2d 335, 342-43 (S.D.N.Y. 2003).  "Ordinarily, the question of materiality of misrepresentation is a question of fact for the jury.  However, where the evidence concerning the materiality is clear and substantially uncontradicted, the matter is one of law for the court to determine."  *Process Plants Corp. v. Beneficial Nat's Life Ins. Co.*, 53 A.D.2d 214, 216 (N.Y. App. Div. 1976); *see also First Fin. Ins. Co. v. Allstate Interior Demolition Corp.*, 193 F.3d 109, 119 (2d Cir. 1999) ("the burden is on the insurer to establish that it would have rejected the application if it had known the undisclosed information").

When it comes to materiality, American General hangs its hat on the Swiss Re underwriting guidelines.  Those guidelines, it argues, hold that a $5 million insurance policy was not supportable to replace Diana's true income, which turned out to be far less than $600,000.  Rather, estate planning provisions in the guidelines would have qualified her for not more than $2.7 million in insurance in 2005, using a $3 million net worth assumption as discussed above.  American General therefore argues that the false $600,000 and $3 million estimates were material, since the same $5 million policy would not have issued had American General known the truth about Diana's income and assets.  In response, the Trust argues that there are issues of material fact as to whether American General would have approved the $5 million Policy even if it knew about the misrepresentations, as demonstrated by American General's willingness to ignore red flags during the underwriting diligence process, and its willingness to deviate from the Swiss Re guidelines to profit from the high-value life insurance market.

The Court finds that the Trust has proffered sufficient evidence to raise material factual questions as to whether the same $5 million Policy still would have issued even if American General had known of the misrepresentations.  First, the underwriters' testimony is probative as to how closely American General followed the Swiss Re guidelines.  Although Kathleen Maio testified that American General underwriters are strictly bound by the guidelines, Robert Cicchi testified that the primary underwriter for Diana's policy, Tom Ahl, had discretion to deviate from the guidelines.  *See* Benhaim Decl. Ex. U (Tr. at 54 (Q:  "So specifically as to the Diana Spira policies, he had the discretion to deviate from the guidelines; is that correct?" A: "Yes, he did.")).  For his part, Tom Ahl testified somewhat obliquely that he would, in fact, exercise his discretion on issues such as review of medical records, but that he "wouldn't be an idiot" in doing so.  Benhaim Decl. Ex. V (Tr. at 58).  However abstract, testimony about underwriter discretion tends to undercut American General's position that mathematical formulas in the Swiss Re guidelines conclusively establish materiality.

Second, it is significant that in the most extensive third-party report prepared during the diligence process, the LabOne "Mid-Level Inspection Report," the only figures listed after a telephonic interview were $19,200 in unearned income and $1,212,000 in assets.  The report also noted "declined" in several rows.  American General contends it is not unusual for interviewees to decline to provide financial information during such interviews, particularly when the information has been provided previously.  This response, however, begs the question of why request the Mid-Level Inspection Report at all.  If the responses were based on an interview of Simon, albeit conducted while Diana was in the room, and if American General did not (and routinely does not) take issue with interviewees declining to state their income and assets, that tends to call into question just how rigorous the diligence is.  And if less than rigorous because

15

the company does not follow up on interviewee declinations or potential discrepancies, that laxity tends to support the Trust's position that American General's zeal for high-value life insurance policies overshadowed its diligence. This, in turn, raises questions regarding the materiality of the income and net worth estimates.

Third, the Trust points to additional record evidence which the Trust argues demonstrates American General's routine disregard for the Swiss Re underwriting guidelines. Some of the points the Trust seeks to make are not persuasive. For example, any mention of other insurers' underwriting practices is hardly relevant. *Mutual Ben. Life Ins. V. Morley*, 722 F. Supp. 1048, 1051 (S.D.N.Y. 1989). Additionally, references to similar policies American General issued despite blank answers in policy applications are of limited relevance, because the company may have verified the applicants' financial qualifications through independent means. *Nat'l Specialty Ins. Co. v. 218 Lafayette St. Corp., LLC*, No. 06-cv-4210, 2008 WL 629994, at *4 (S.D.N.Y. Mar. 10, 2008). Finally, discussion of the evolution of American General's practices *after* issuance of the Policy in 2005 is of limited relevance too, because materiality is assessed at the time the Policy issued, irrespective of subsequent remedial measures. *See Fine v. Bellefonte Underwriters Ins. Co.*, 725 F.2d 179, 183 (2d Cir. 1984).

On the other hand, as to certain other evidence, the Trust's arguments have more currency. For example, American General concedes that, after inquiry, it learned that an additional $250,000 in life insurance (two additional policies) existed on Diana's life, on top of what she had disclosed in the Policy application. In a case where the company says great weight was placed on the insurance-to-net worth ratio, the discovery of misstatements regarding preexisting insurance arguably should have raised concerns and prompted follow-up if American General considered the information in the Policy application to be material.

Additionally, the parties' briefing highlights divergent views on the interpretation of a notation in a business record made by underwriter Kathy Trindl.  The Trust argues that her notation, "$6.8 million," referred to the maximum allowable insurance for Diana.  Aggregating the $5 million policy with $2.1 million in preexisting insurance, the Trust contends issuance of the Policy exceeded the $6.8 million limit, thus further demonstrating the absence of true diligence.  American General disputes this, arguing that the Trindl notation had no such significance, and that it simply represented Trindl's (inaccurate) estimate of the total insurance that would be in force on Diana's life after issuance of the $5 million policy.  For the Court's purposes on summary judgment, the record does not unequivocally support one interpretation of the Trindl notation or the other, thus raising a factual question.

Ultimately, having weighed the parties' submissions and the evidence cited, the Court concludes that there is a genuine dispute of fact in this case on the materiality element of the rescission claim.  The underwriters had discretion to deviate from the guidelines.  The company did not take issue with possible discrepancies between the figures in the Policy application and financial questionnaire and those in the Mid-Level Inspection Report, or with interviewees declining to provide such figures upon request.  The company also did not take issue with Diana's misstatements in the Policy application about life insurance then in force.  Last, certain documentary evidence suggests, at least arguably, that the company was willing to issue the Policy even if it exceeded a $6.8 million limit.

Presented with this evidence, a reasonable jury could conclude that American General would have issued the same Policy even had it known Diana's true income and net worth, and that representations regarding income and assets were therefore immaterial and do not support rescission.  As such, the Court DENIES American General's motion for summary judgment.

### C. The Trust's Motion

The Trust cross-moves for summary judgment on two grounds.  First, the Trust argues that American General knew, based on figures in the Mid-Level Inspection Report, that the $600,000 and $13 million figures in the Policy application and financial questionnaire were inaccurate, and that the Trust issued the Policy anyway, thereby waiving any right to void the Policy based on misrepresentations.  Second, the Trust argues that American General should be estopped from seeking rescission because it accepted premiums after learning of the potential misrepresentations.  The Court will address these arguments in turn.

### 1. Waiver

As the Trust points out, an insurer "cannot close its eyes to the obvious" and then void a contract based on misrepresentations.  *Variety Homes, Inc. v. Postal Life Ins. Co.*, 287 F.2d 320, 323 (1961).  The Trust contends that the figures in the Mid-Level Inspection Report made plain that Diana's income and net worth were far less than what she had represented on the Policy application and financial questionnaire.  The Court disagrees.  First, the Mid-Level Inspection Report was derived from statements Simon, not Diana, made during a telephonic interview, which calls into question how much weight that report should have been given.  Second, in reply briefing, American General has cited to testimony from Tom Ahl and Kathleen Maio which explains that the figures in the Mid-Level Inspection Report appeared to be partial income and asset estimates, rather than comprehensive, reliable estimates directly inconsistent with Diana's previous representations.  *See* Wilson Decl. Ex. B-9 (Tr. at 120); Maio Supp. Decl. ¶ 4.  According to Ahl and Maio, it is routine for interviewees to decline to provide certain financial information, and declinations of this sort do not necessarily raise concerns in the insurance underwriting profession.  *See id.*  If deemed to be credible, this testimony would belie the Trust's

argument that American General was on constructive, or inquiry, notice of the misrepresentations. The testimony also makes this case distinguishable from precedents where it was established that the insurer had actual knowledge of misrepresentations. *See, e.g.*, *Fleet Messenger Service, Inc. v. Life Ins. Co. of North Am.*, 315 F.2d 593, 595 (2d Cir. 1963) (finding no insurer waiver in material misrepresentation case premised on applicant's false denial of heart disease, even where insurer actually knew applicant had falsely stated that he had not had a medical examination in last five years). Far from supporting judgment as a matter of law, the presence of countervailing evidence as to the significance of the figures and declinations in the Mid-Level Inspection Report creates triable issues better put to a jury.

### 2. Estoppel

The Trust also argues that American General's acceptance of premiums should estop the company from seeking rescission. The Trust cites a number of authorities in support of the proposition that collecting premiums with knowledge of grounds for rescission precludes an action to rescind. Those authorities are factually distinguishable from this case. In *American General Life Ins. V. Salamon*, for example, the insurer retained premiums after notifying its insured of its intent to rescind the policy due to a misrepresentation in the policy application. 483 Fed. App'x 609, 611 (2d Cir. 2012). Similarly, in *United States Life Ins. Co. in the City of N.Y. v. Blumenfeld*, the insurer accepted premium payments after filing lawsuits seeking to rescind the policy due to a misrepresentation in the policy application. 938 N.Y.S.2d 84, 84 (N.Y. App. Div. 2012). In the other cases cited, the insurer likewise accepted premiums after it had actual knowledge of misrepresentations and was pursuing action to redress the same.

In contrast, here, American General received the last premium payment on the Policy in January 2007. American General was privy to information in the Mid-Level Inspection Report

at that point, but the figures and declinations in the report, standing alone, do not conclusively support waiver or estoppel, as discussed above. Diana died in June 2007, five months after American General accepted the last premium payment. American General subsequently undertook a routine investigation, and, some eight months after accepting the last premium payment, the company interviewed Simon and his grandsons. At that point, the company was unable to substantiate Diana's prior income and asset representations, and, arguably, only then was American General on notice of a problem. The company subsequently pursued action to redress the same. The Court finds that accepting premium payments eight months before becoming aware of possible misrepresentations does not support estoppel according to the authorities cited, and does not support judgment as a matter of law here. Again, questions concerning the weight American General assigned, or should have assigned, to the various data points it received throughout the diligence process (i.e., questions regarding materiality) are better left to a jury.

Whether premised on the doctrine of waiver, or on the doctrine of estoppel, the Trust's motion for summary judgment is DENIED.

## IV. CONCLUSION

For the reasons stated above, American General's motion for summary judgment is DENIED. The Clerk of Court is respectfully requested to terminate this motion (dkt. no. 125).

The Trust's cross-motion for summary judgment also is DENIED. The Clerk of Court is respectfully requested to terminate this motion (dkt. no. 132).

Dated:   November 25, 2014　　　　　　　　　　SO ORDERED:
           White Plains, New York

_____
NELSON S. ROMÁN
United States District Judge